UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

NATURAL RESOURCES DEFENSE COUNCIL, :
INC.,
                                    :
              Plaintiff,                  05 Civ. 8005 (LMM)
                                    :
         - v -                            MEMORANDUM AND ORDER
                                    :
UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,                :

              Defendants.           :

------------------------------------x

STATE OF NEW YORK, PEOPLE OF THE    :     05 Civ. 8008 (LMM)
STATE OF CALIFORNIA, EX REL. BILL
LOCKYER, ATTORNEY GENERAL, STATE OF:
CONNECTICUT and STATE OF ILLINOIS,
                                    :
              Plaintiffs,
                                    :
         - v -
                                    :
UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,                :

              Defendants.           :

------------------------------------x

McKENNA, D.J.,

                        **1.**

        The Plant Protection Act ("PPA") (2000) provides (with an

exception not relevant here) that

          no person shall import, enter, export, or move in
          interstate commerce any plant pest, unless the
          importation, entry, exportation, or movement is
          authorized under general or specific permit and is
          in accordance with such regulations as the
          Secretary [of Agriculture] may issue to prevent the
          introduction of plant pests into the United States

or the dissemination of plant pests within the
United States.

7 U.S.C. § 7112(a).

On September 16, 2004, the Animal and Plant Health
Inspection Service ("APHIS") of the United States Department of
Agriculture[1] amended, effective September 16, 2005, the regulations
for the importation into the United States of unmanufactured wood
articles used as packaging for cargo.  69 Fed. Reg. 55719-55733
(Sept. 16, 2004) (codified in 7 CFR, Pt. 319, § 319.40 (2006)).[2]

In explaining the amended regulations, APHIS noted that
"[i]ntroductions into the United States of exotic plant pests such
as the pineshoot beetle . . . and the Asian longhorned beetle . . .
have been linked to the importation of [what the previous
regulations called 'solid wood packing material' or 'SWPM']," and
that "[t]hese and other plant pests that are carried by some
imported SWPM pose a serious threat to U.S. agriculture and to
natural, cultivated and urban forests."  69 Fed. Reg. 55719.  The
amended "regulations restrict the importation of many types of wood
articles, including wooden packaging material such as pallets,
crates, boxes, and pieces of wood used to support or brace cargo."
Id.  The standard embodied in the amended regulations "calls for

_____

[1] APHIS and the Deputy Director of Plant Protection and Quarantine
have been delegated authority to administer the PPA.  See 7 CFR § 371.3.

[2] An Advance notice of proposed rulemaking was published in 1999,
see 64 Fed. Reg. 3049-3052 (Jan. 20, 1999); a Proposed rule and notice
of public hearings was published in 2003, see 68 Fed. Reg. 27480-27491
(May 20, 2003).

wood packaging material to be either heat treated or fumigated with methyl bromide, in accordance with the [Guidelines for Regulating Wood Packaging Material in International Trade, approved by the Interim Commission on Phytosanitary Measures of the International Plant Protection Convention on March 15, 2002], and marked with an approved international mark certifying treatment." Id. The regulations "will affect all persons using wood packaging material in connection with importing goods into the United States." Id.

APHIS also noted that "Methyl bromide as a class I ozone-depleting substance has been found to cause or contribute significantly to harmful effects on the stratospheric ozone layer. . . ." 69 Fed. Reg. 55721.

Plaintiffs[3] -- the Natural Resources Defense Council, Inc., and the states of New York, California, Connecticut and Illinois -- do not challenge specifics of the amended regulations, but, rather, in essence, the failure of APHIS to properly consider and weigh an unadopted alternative to heat treatment or fumigation with methyl bromide:  "a phased transition away from raw wood pallets and crates, replacing them with packing materials made of substitute materials, such as processed wood, fiberboard, plywood, and plastics, that are impervious to the insect pests." (Pl. Mem. at 1.)  That alternative, they urge, would at the same time afford the greatest protection against insect pests and also minimize the

---

[3] Plaintiffs' standing is not disputed.

3

destructive consequences to the ozone layer of fumigation with methyl bromide.   Plaintiffs "do not seek to overturn the rule." (Pl. Responsive Mem. at 3.)   Rather, they "ask the Court to order APHIS to reconsider its environmental impact analysis in light of its obvious defects and then to revise the rule as appropriate based on any supplemental findings."   (Id.)

APHIS, plaintiffs contend, has violated both the National Environmental Protection Act ("NEPA") and the PPA in failing to consider the alternative they advocate.

Plaintiffs, jointly, move for summary judgment pursuant to Fed. R. Civ. P. 56, while defendants cross-move for dismissal pursuant to id. 12(b)(6) or, alternatively, summary judgment pursuant to id. 56.   Whatever the form of the motions, in a case seeking review of agency action:

> "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."   The task of the reviewing court is to apply the appropriate [Administrative Procedure Act ("APA")] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.

Florida Power & Light Co. v. Lorian, 470 U.S. 729, 743-44 (1985) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973), and citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971)).[4]

---

[4] In what follows, "AR" refers to the Administrative Record, filed in CD-ROM form.   The numbering system for the contents of the AR is described in Def. Mem. at 4 n.3.

4

The parties are in agreement that this Court's review of the challenged action is governed by the APA.  (Pl. Mem. at 23; Def. Mem. at 26.)

> It is settled law that under the APA a reviewing court may set aside an agency's decision only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  A court may not substitute its judgment for that of the agency, and, when a particular controversy requires an agency's reconciliation of conflicting and overlapping congressional policies, a court "should hesitate to disturb the administrative determination."
>
> A successful challenge to an agency's decision under the arbitrary and capricious standard must clearly demonstrate that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  A reviewing court may neither weigh alternatives available to the agency and then determine which is the more reasonable, nor resolve conflicts in the testimony "unless on its face it is hopelessly incredible."

Soler v. G. & U., Inc., 833 F.2d 1104, 1107 (2d Cir. 1987), cert. denied, 488 U.S. 832 (1988) (quoting 5 U.S.C. § 706(2)(A), Hudson Transit Lines, Inc. v. United States, 765 F.2d 329, 336 (2d Cir. 1985), Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983), and NLRB v. Warrensburg Board & Paper Corp., 340 F.2d 920, 922 (2d Cir. 1965)) (other citations omitted). See also Environmental Defense v. United States Environmental Protection Agency, 369 F.3d 193, 201 (2d Cir. 2004).

**2.**

The parties, in substance, agree that both the introduction into the United States of destructive insect pests such as the Asian longhorned beetle and the release into the air of methyl bromide are seriously negative environmental events. Plaintiffs urge that the best way to deal with both is the option that would phase in a requirement that substitute or alternative packing materials replace the wood materials the new rule as promulgated will only regulate.

However, plaintiffs contend, even though APHIS acknowledged the reasonableness of the option that plaintiffs advocate[5] and indicated in its Advance notice of rulemaking that that option was to be considered (64 Fed. Reg. 3049, 3051 (Jan. 20, 1999)), and received substantial commentary on, and favoring, that option, it nevertheless did not really consider the option, and so failed to comply with NEPA's mandate that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 CFR § 1502.14(a). See also Natural Res. Def. Council, Inc. v. Callaway, 524 F.2d 79, 93 (2d Cir. 1975). All APHIS considered, as described by plaintiffs, "was the 'staw man' option of an <u>immediate</u>

---

[5] APHIS does not disagree that this option is, from an environmental point of view, the best. "Regarding alternative packing materials, the final environmental impact statement . . . concluded . . . that these would achieve the greatest possible reduction in risk from the introduction of pests and pathogens associated with [wood packing materials]" and would "generate[] only minimal amounts of ozone-depleting chemicals."  69 Fed. Reg. at 55721.

ban on raw wood packaging." (Pl. Mem. at 27.) And even the 'straw man" option, plaintiffs add, is not supported by the record. (<u>Id.</u> at 28-34.)

Plaintiffs also argue that the Final Environmental Impact Statement ("FEIS") and the new rule reflect "a highly skewed analysis of the environmental impacts of methyl bromide fumigation." (<u>Id.</u> at 34.) The estimates of the FEIS on which APHIS acted, plaintiffs urge, are severely flawed, unsupported by the record, and affected by inadequate conclusory assumptions. (<u>Id.</u> at 34-40.)[6]

Plaintiffs argue, in addition, that APHIS has violated the Plant Protection Act ("PPA"), emphasizing that the Act gives the Secretary (and thus, by delegation, APHIS (<u>see</u> n.1, <u>supra</u>)), authority "to <u>prevent</u> the introduction of plant pests into the United States," 7 U.S.C. § 7711(a) (emphasis added by plaintiffs), and states that it is the Secretary's responsibility to facilitate

---

[6] Plaintiffs vigorously dispute APHIS' estimate of the worldwide increase in methyl bromide usage that implementation of the rule will entail, 384 to 4630 metric tons per year. (Def. Mem. at 25.) (<u>See</u> FEIS, AR II.1, at 66-67.) At the close of the initial briefing of the parties' motions, defendants advised the Court that one of the assumptions underlying APHIS' estimates was flawed: <u>i.e.</u>, the assumption "that all [methyl bromide] fumigation would occur 'pre-loading,' rather than 'post-loading.'" (Def. Mem. at 45.) "APHIS now concedes that the justification for the [methyl bromide] estimate in the [FEIS] was flawed; the agency erred in asserting that shippers in China eventually began to fumigate all [wood packing material] prior to loading." (Letter, A.U.S.A. Turner to Court, June 21, 2006, at 3.) "Fumigating 'post-loading' requires much more methyl bromide than fumigating 'pre-loading'. . . ." (<u>Id.</u> at 2.) APHIS is developing a revised estimate. (<u>Id.</u>)

commerce "in ways that will <u>reduce, to the extent practible</u>, as determined by the Secretary, the risk of dissemination of plant pests. . . ." <u>Id.</u> § 7701(3) (emphasis added by plaintiffs).  The PPA, plaintiffs argue, "requires APHIS to adopt the most effective practicable alternative.  The statute does not authorize the agency to set an arbitrary level of 'acceptable' pest risk, or 'necessary' pest protection, such that APHIS may reject more effective alternative methods that are practicable." (Pl. Mem. at 41.)  In the present situation, plaintiffs conclude, "APHIS itself identifies an alternative that eliminates the risk [<u>i.e.</u>, the phase-in of substitute packing material as advocated by plaintiffs, and] APHIS must fully and fairly evaluate that alternative to determine if it is practicable, and if so, adopt it." (<u>Id.</u> at 42.)

**3.**

The Secretary, while not accepting plaintiffs' arguments, also goes beyond them to explain why it chose to adopt "a set of internationally approved standards currently being implemented by the United States' trading partners around the world, including Canada, the European Union, China, and many others," (Def. Mem. at 1), and to describe the legal context for its action.

The PPA, enacted in 2000, provides that "[t]he Secretary [of Agriculture] shall ensure that phytosanitary[7] issues involving

---

[7] "Phytosanitary" means relating to protection against threats to plant health.  <u>See</u> Def. Mem. at 4 n.2.

imports and exports are addressed based on sound science and consistent with applicable international agreements." 7 U.S.C. § 7751(e).[8]

In the new rule, APHIS adopted what it described as "an international standard entitled 'Guidelines for Regulating Wood Packaging Material in International Trade' that was approved by the Interim Commission on Phytosanitary Measures of the International Plant Protection Convention ["IPPC"] on March 15, 2002." 69 Fed. 55719. The IPPC is an organization of some 117 contracting parties of which the United States is one, the purpose of which "is to secure common and effective action to prevent the spread of pests of plant products, and to promote appropriate measures for their control. (Guide to the International Plant Protection Convention [AR VI.2], at 2.) In March of 2002, the IPPC promulgated its International Standards for Phytosanitary Measures: Guidelines for Regulating Wood Packaging Material in International Trade. ("IPPC Guidelines.") (AR III.39.) APHIS followed, in substance, those Guidelines.

---

[8] Legislative history indicates that one of the three main goals of the PPA was to "[f]acilitate agricultural trade in compliance with international obligations and standards." H.R. Rep. 106-1042 (2001), at 14-15.

**4.**

The Court considers first plaintiffs' argument that APHIS, in adopting the new rule, violated the PPA. The argument is not persuasive.

Plaintiffs' position, in essence, is that the PPA, in 7 U.S.C. §§ 7712(a) and 7701(3), requires APHIS to adopt the rule that will most effectively reduce pest risk, and that that is the end of the question. (See Pl. Mem. at 40-42; Pl. Responsive Mem. at 16-18; Section 3 of this Memorandum and Order, supra.) That view is both too narrow and not supported by the language of the PPA.

In the first place, the Supreme Court has pointed out that its decision in Vermont Yankee Nuclear Power Corp v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558 (1978), "cuts sharply against the . . . conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations." Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227 (1980) (per curiam).

In the second place, the PPA mandates the consideration of factors other than the environment.

7 U.S.C § 7701(3), on which plaintiffs explicitly rely, states that "it is the responsibility of the Secretary to facilitate exports, imports, and interstate commerce in

10

agricultural products and other commodities that pose a risk of harboring plant pests or noxious weeds," <u>id.</u>, but goes on to add that the Secretary is to do so "in ways that will reduce, to the extent practicable, as determined by the Secretary, the risk of dissemination of plan pests or noxious weeds." <u>Id.</u> It is clear, therefore, that in adopting the rule, the Secretary, acting through APHIS, in addition to reducing the risk of plant pests, is obliged as well to consider the facilitation of commerce.  What is more, the use of the phrase "to the extent practicable, as determined by the Secretary," <u>id.</u>, makes it clear that, in considering the rule and the alternatives, the Secretary, acting through APHIS, is given room for "the application of agency expertise and discretion." <u>See</u> <u>Conservation Law Foundation v. Evans</u>, 360 F.3d 21, 28 (1st Cir. 2004).  Facilitation of commerce certainly entered into the decision to adopt the new rule.  <u>See</u> 69 Fed. Reg. 55721 ("Alternative packing materials [involve] a cost that is currently beyond the reach of exporters in many developing countries. . . .") and <u>id.</u> 55722 (". . . prohibiting the use of unmanufactured wood as a packaging material would have significant negative consequences in economic and environmental arenas.  Wood is often the only packaging material readily and cheaply available . . . in developing countries that export basic products without elaborate packaging.")

Finally, the PPA requires the Secretary ("[t]he Secretary shall. . . .") to ensure that phytosanitary issues involving imports and exports are . . . consistent with applicable international agreements." 7 U.S.C. § 7751(e). As described above, the new regulations are based on the IPPC Guidelines and are fully consistent with applicable international agreements.[9]

In short, the PPA, as applied to the present dispute, vests the Secretary with the duty of crafting a rule that will reduce the risk of plant pests consistently with applicable international agreements and at the same time facilitate international commerce, and discretion to weigh the facts and issues in so doing. The record is clear that the Secretary, acting through APHIS, did so in the present case.

Plaintiffs have not shown that the adoption by APHIS of the new rule violated the PPA.

---

[9] For a full description of the international background to APHIS' use of the IPPC Guidelines, see Def. Mem. at 3-6.

Plaintiffs argue that APHIS need not have followed the IPPC Guidelines in order to be consistent with international agreements because the World Trade Organization Agreement on the Application of Sanitary and Phytosanitary Measures ("SPS Agreement") (AR VI.8), which, among other things, seeks to protect trade by eliminating trade protectionist actions, "allow[s] members to impose higher levels of [phytosanitary] protection than required by international standards if a member concludes (based on scientific and economic factors recognized as valid under the Agreement) that the international standards do not provide adequate protection." (Def. Mem. at 5 (summarizing SPS Agreement, Art. 3, cl. 1 [AR VI.8 at 2].) However, the SPS Agreement also "provides a safe harbor for measures that do conform to international standards." (Id. (summarizing SPS Agreement, Art. 3, cl. 2 [AR VI.8 at 2].) The "safe harbor" obtained by following the IPPC Guidelines is certainly of value in facilitating trade by avoiding trade disputes (see Def. Reply Mem. at 14-15), and the choice to follow the IPPC Guidelines was well within the Secretary's discretion.

The Court considers next plaintiffs' arguments under NEPA.

**5.**

The purpose and basic requirements of NEPA were classically summed up in <u>Sierra Club v. United States Army Corps of Engineers</u>, 701 F.2d 1011 (2d Cir. 1983):

> As the Supreme Court has stated repeatedly, although NEPA established "'significant substantive goals for the Nation,'" the balancing of the substantive environmental issues is consigned to the judgment of the executive agencies involved, and the judicially reviewable duties that are imposed on the agencies are "'essentially procedural.'" "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'"
>
> The primary function of an environmental impact statement under NEPA is "'to insure a fully informed and well-considered decision,' [although] not necessarily 'a decision the judges of the Court of Appeals or of [the Supreme] Court would have reached had they been members of the decisionmaking unit of the agency.'" In order to fulfill its role, the [Environmental Impact Statement ("EIS")] must set forth sufficient information for the general public to make an informed evaluation, and for the decisionmaker to "consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action." In so doing, the EIS insures the integrity of the process of decision by giving assurance that stubborn problems or serious criticisms have not been "swept under the rug." The "'detailed statement'" required by § 102(2)(C) of NEPA [, 42 U.S.C. § 4332(2)(C),] thus "is the outward sign that environmental values

13

and consequences have been considered during the planning stage of agency actions."

Id. at 1029 (quoting Strycker's Bay, 444 U.S. at 227, Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976), County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1375 (2d Cir. 1977), cert. denied, 434 U.S. 1064 (1978), Silva v. Lynn, 482 F.2d 1282, 1285 (1st Cir. 1973), and Andrus v. Sierra Club, 422 U.S. 347, 350 (1979)) (other citations omitted).  See also Stewart Park & Reserve Coalition, Inc. v. Slater, 352 F.3d 545, 557-58 (2d Cir. 2003).

Here, in the FEIS (AR II.1.), APHIS, noting the "nature and severity of the risk from the wood packing material accompanying shipments in international trade," stated that it proposed "to adopt the IPPC Guidelines while it considers the need for a more long-term and permanent solution to the [wood packing material] problem."  (FEIS at 3.)  It considered that and four alternatives:

> (1) No Action (no change in the current regulation), (2) Extension of the Treatments in the China Interim Rule to All Countries, (3) Adoption of the IPPC Guidelines, (4) a Comprehensive Risk Reduction Program, and (5) Substitute Packing Materials Only.  Each of the alternatives consists of specific component methods for the mitigation of risk from [wood packing material].

(Id. at 9.)[10]   The possible environmental consequences of the five alternatives are reviewed in the FEIS.

The FEIS acknowledges that "the prohibition of SWPM and the requirement to switch to substitute packing materials would result in substantially less pest and disease risk than any of the other components considered in this [F]EIS."   Id. at 42.   The effects of methyl bromide on the ozone layer are considered in detail.   Id. at 54-57.   And the FEIS further acknowledges that "[]he logical response to address the issue of methyl bromide use relative to ozone depletion potential is to promote the use of alternate phytosanitary methods (such as substitute packing materials) to deal with [solid wood packing materials] used in international trade."   Id. at 78.   For reasons summarized above, however, APHIS did not adopt that approach.

**6.**

Plaintiffs argue that there are three ways in which APHIS failed to comply with NEPA.

First, plaintiffs contend that APHIS did not consider the option of a phase-in of substitute materials, but only the "straw man" of an immediate replacement of wooden with substitute packing materials.   The record does not support this argument.

---

[10]  The China Interim Rule refers, collectively, to two rules promulgated by APHIS in 1998 governing wood packing material applicable to shipments from China only:  63 Fed. Reg. 50,100 (Sept. 18, 1998), and 63 Fed. Reg. 69,539 (Dec. 17, 1998).

In its Advance Notice of Proposed Rulemaking, in 1999, APHIS pointed out that one option for dealing with the problems it wished to address was the prohibition of the usual wood packaging materials in favor of alternative materials such as processed wood and nonwood materials.  Noting that such action could have an undesirable effect on international trade, it added that "[t]his effect could be mitigated by a phase-in period to allow shippers to adjust to the prohibition. . . ." 64 Fed. Reg. 3049, 3051.  The Draft Environmental Impact Statement ("DEIS") of October 2002 (AR II.2) discusses the substitute materials option (see DEIS at 12, 36-39, 73-77), and notes that substitute materials "may require a phase-in period to allow the industry to adopt these materials to the shipping processes."  (DEIS at 37; see also id. at 75.)  The FEIS notes that "[s]ubstitute packing materials would require a phase-in period to allow the industry of the regulated countries to adapt these materials to the shipping processes." (FEIS [AR II.1] at 41; see also id. at 81.)

Second, plaintiffs urge that the FEIS "failed to examine rationally the amount of ozone-destroying methyl bromide that will be used due to the [new] Rule." (Pl. Responsive Mem. at 1.)  In support of this argument, plaintiffs identify two instances in which APHIS had estimated ranges of amounts of methyl bromide that would be released as a result of rulemaking that, plaintiffs argue,

are not consistent with the range of 384 to 4630 metric tons given in the FEIS.  (FEIS [AR II.1] at 66-67.)

The first instance relates to the China Interim Rule. (See n.9, supra.)  In a September 18, 1998 Interim Rule and Request for Comments, APHIS stated that it "estimates that, if China were to comply with the interim rule by fumigating SWPM shipments with methyl bromide, China could use between 1,040 and 12,565 metric tons of methyl bromide annually."  63 Fed. Reg. 50100, 50109.  This range is referenced in the FEIS in the present case (FEIS [AR II.1] at 29; 56), and noted to be based on "conservative assumptions." (Id.)   The FEIS explains that "[t]he actual [quarantine and preshipment] usage from the China Interim Rule is known to be considerably less than anticipated from the risk analysis due to the analysis assumption that loaded cargo with SWPM would be fumigated rather than fumigation of SWPM prior to cargo loading," while "[i]t is known that most shippers fumigate SWPM prior to cargo loading to lower costs, avoid agricultural commodity tolerance issues, and to prevent damage to sensitive commodities." (Id. at 56.)   Defendants now concede that this last statement is not correct.  (See n.6, supra.)

The second instance cited by plaintiffs is from a Final Environmental Impact Statement of September 2002, relating to a Rule for the Importation of Unmanufactured Wood Articles from Mexico, with Consideration for Cumulative Impact of Methyl Bromide

Use (AR II.35), where it is noted that the rule there under consideration (affecting, it appears, trade between the United States and Mexico only) "could result in potential releases to the atmosphere ranging from 8,536 [metric tons] to 102,893 [metric tons] per year based upon information from trade summaries." (Id. at 65.)   While the Mexico Environmental Impact Statement is referenced in the FEIS in the present case (AR II.1 at 57, 90), the estimated methyl bromide release figures do not appear to be set forth there.

Defendant initially argued that the Mexico Rule Environmental Impact Statement analysis was a "worst-case scenario" that assumed that all fumigation would occur post-loading "as the China Interim Rule estimate assumed," and pointed out that the Mexico Rule Environmental Impact Statement "concluded that the 'actual increase in methyl bromide usage would actually be closer to one-twentieth' of this 'worst-case scenario' amount, equating to an additional release of 427 to 5,145 [metric tons] per year." (Def. Mem. at 45 (citing AR II.35 at 66).)

The Mexico Rule Environmental Impact Statement states that:  "As was shown with the interim rule for China, SWPM is more likely to be treated prior to use in loading the commodity, so the actual increase in methyl bromide usage would actually be closer to one-twentieth (1/20) of the projected usage in this assessment." (AR II.35 at 65-66 (footnote omitted).)

18

Two things appear from the Mexico Rule Environmental Impact Statement:  first, that the assumption used to support the low estimate of annual methyl bromide releases attributable to the Mexico Rule is the same assumption that supports the low estimate in the case of the China Interim Rule, and is derived from the China Interim Rule assumption that most fumigation will occur pre-loading (now conceded to be erroneous); and, second, that the difference in the amount of methyl bromide releases between post-loading fumigation and pre-loading fumigation, respectively, is approximately 20 to 1.

Defendants have already stated a willingness, prompted by the flawed assumption described in the government's letter of June 21, 2006 (see n.6, supra), to produce a supplemental Environmental Impact Statement which will include a new methyl bromide release estimate.  (Gov't Supp. Mem. at 1.)  That estimate must also include consideration of the methyl bromide release estimate contained in the Mexico Rule Final Environmental Impact Statement of September 2002 discussed above.

Plaintiff's third argument in support of its claim that APHIS violated NEPA is that APHIS committed to the course of action it finally took before undertaking an Environmental Impact Statement and that "such predetermined conclusions are invalid as a matter of law under NEPA."  (Pl. Responsive Mem. at 2.)  This argument is not persuasive.

19

It is true that at least as early as the DEIS of October 2002 APHIS was proposing to adopt the IPPC Guidelines (see DEIS [AR II.2] at iii), which, in the FEIS, APHIS identified as its "preferred alternative." (FEIS [AR II.1] at 3.) There is nothing wrong, however, with an agency having a proposal or preferred alternative in mind when it enters into the Environmental Impact Statement process. Indeed, NEPA contemplates that it will. See 42 U.S.C. § 4332(2)(C)(1) (every recommendation or report on proposals for major federal actions significantly affecting quality of human environment to include statement on "proposed" action); see also 40 CFR § 1502.14 (environmental impact statement to present environmental impacts of "the proposal and the alternatives").

For the reasons discussed above in this section of this Memorandum and Order, the Court finds that APHIS has not violated NEPA except in the matter of its estimate of the amount of methyl bromide that will be released into the atmosphere by reason of the rule at issue. In that regard, however, APHIS (even though its failures may be inadvertent) has not complied with NEPA but rather acted arbitrarily and capriciously in that (i) its assumption that pre-loading fumigation will substantially replace post-loading fumigation is flawed, (ii) that flaw affects the methyl bromide release findings of the FEIS in a significant way, and (iii) the relation of its much higher estimates in connection with the China Interim Rule and the Mexico Rule to the present situation have not

been considered adequately, or, if they have been, have not been adequately explained in the FEIS.

APHIS is to prepare and circulate a supplemental Environmental Impact Statement including a corrected estimate of the amount of methyl bromide that will be released annually, taking into consideration the higher estimates reached in connection with the China Interim Rule and the Mexico Rule, and explaining its views on the environmental impact of such new information and how that affects its decision to proceed or not with the rule at issue now in effect. The supplemental Environmental Impact Statement must articulate a satisfactory relationship between the facts found and the choice made. Waterkeeper Alliance, Inc. v. United States Environmental Protection Agency, 399 F.3d 486, 498 (2d Cir. 2005).[11]

APHIS must, after considering its new methyl bromide release estimate, evaluate its rulemaking decision anew. "Although an [Environmental Impact Statement] may be supplemented, the critical agency decision must, of course, be made after the supplement has been circulated, considered and discussed in the light of the alternatives, not before. Otherwise the process becomes a useless ritual, defeating the purpose of NEPA, and rather making a mockery of it." Natural Resources Defense Council, Inc.

---

[11] Apart from revision of methyl bromide release information and consideration of APHIS' rulemaking action in light of the new information, the Court sees no need for supplementation of the FEIS in other respects unless APHIS believes it to be appropriate.

v. Callaway, 524 F.2d 79, 92 (2d Cir. 1975).  The amount of methyl bromide that will be released is too significant a question to treat as a mere correctible inaccuracy to be made without considering the impact of new information.  (Cf. Def. Supp. Mem. at 3 (citing Sierra Club, 701 F.2d at 1035).)  A corrected methyl bromide estimate in a supplemental Environmental Impact Statement cannot be regarded as a matter wholly unrelated to APHIS' rulemaking, as defendants may be suggesting.  (See Def. Supp. Mem. at 4.)

The Court does not impose a schedule because it understands the revision of the methyl bromide release information to be in progress, and is confident that the Secretary will act with reasonable promptness.

7.

For the reasons set forth above plaintiffs' motion is granted in part and denied in part and defendants' motion is granted in part and denied in part, and this matter is remanded to the Secretary for action consistent herewith.[12]

SO ORDERED.

Dated:  June 4, 2007

_____
Lawrence M. McKenna
U.S.D.J.

_____

[12] The Clerk will close both of the above cases.